**Thomas Wayne JOYCE, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 23784.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 18, 1970.

Decided Oct. 26, 1971.

As Amended Dec. 2, 1971.

Certiorari Denied Feb. 28, 1972.
See 92 S.Ct. 1188.

Fahy, Senior Circuit Judge, concurred in part, dissented from affirmance and filed opinion.

Mr. Joel A. Forkosch, New York City, for appellant.

Mr. John Ellsworth Stein, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry and John F. Evans, Asst. U. S. Attys., were on the brief, for appellee.

Before FAHY, Senior Circuit Judge, and MacKINNON and ROBB, Circuit Judges.

MacKINNON, Circuit Judge:

Following the Declaration of Independence the Continental Congress, finding the Nation in need of a national flag to symbolize its unity and independence,

on June 14, 1777 adopted the following resolution:

> Resolved, that the flag of the United States be 13 stripes alternate red and white, that the Union be 13 stars white in a blue field representing a new constellation.[1]

There is a legend that George Washington, who with Betsy Ross is generally credited with participating in the formulation of the design of the flag, said of its colors:

> We take the stars and blue union from heaven, the red from our mother country separating it by white stripes, thus showing we have separated from her, and the white stripes shall go down to posterity representing liberty.[2]

Other famous citizens of the United States have described the place of the Stars and Stripes in our national life. Justice Holmes in a history of Chief Justice Marshall said:

> The flag is but a bit of bunting to one who insists on prose. Yet, thanks to Marshall and the men of his generation—and for this above all we celebrate him and them—its red is our lifeblood, its stars our world, its blue our heaven. It owns our land. At will it throws away our lives.[3]

The United States Supreme Court in Halter v. Nebraska, 205 U.S. 34, 43, 27 S.Ct. 419, 422, 51 L.Ed. 696 (1907) in an opinion by Justice Harlan said:

> [T]he flag is the symbol of the Nation's power, the emblem of freedom in its truest, best sense. It is not extravagant to say that to all lovers of the country it signifies government resting on the consent of the governed; liberty regulated by law; the protection of the weak against the strong; security against the exercise of arbitrary power; and absolute safety for free institutions against foreign aggression.

In a Flag Day speech President Woodrow Wilson expressed his sentiments concerning the American flag as follows:

> I know of nothing more difficult than to render an adequate tribute to the emblem of our nation. For those of us who have shared that nation's life and felt the beat of its pulse it must be considered a matter of impossibility to express the great things which that emblem embodies.
>
>     \*    \*    \*    \*    \*    \*
>
> The flag of the United States has not been created by rhetorical sentences in declarations of independence and in bills of rights. It has been created by the experience of a great people, and nothing is written upon it that has not been written by their life. It is the embodiment, not of a sentiment, but of a history, and no man can rightly serve under that flag who has not caught some of the meaning of that history.

His tribute indicated his deep feeling for our Nation, its history and the principles which had motivated its actions.

Probably the most moving description of what the American Flag symbolizes to

---

1. 8 Journal of the Continental Congress 464. Congress has designated June 14th as "Flag Day" to commemorate the original adoption of the stars and stripes as the official flag of the United States of America, 36 U.S.C. § 157 (1970) (Aug. 3, 1949, ch. 385, 63 Stat. 492). That week is also designated as Flag Week, 36 U.S.C. § 157a (1970) (June 9, 1966, Pub.L. 89–443, 80 Stat. 194). 4 U.S.C. § 1 (1970) provides:
   > The flag of the United States shall be thirteen horizontal stripes, alternate red and white; and the union of the flag shall be forty-eight stars, white in a blue field. (July 30, 1947, ch. 389, 61 Stat. 642.)
   > On the admission of a new state a new star is added the following 4th of July. 4 U.S.C. § 2 (1970) (July 30, 1947, ch. 389, 61 Stat. 642).

2. This legend is attributed to Betsy Ross' grandson, William J. Canby, who presented it to the Pennsylvania Historical Society in 1870. The World Book Encyclopedia, 1958.

3. Holmes, John Marshall (1901), in Collected Legal Papers 266, 270–271 (1920).

us as a nation was expressed, not by one who was native-born, but by the Honorable Franklin K. Lane, who was born a Canadian citizen in one of its maritime provinces and became a citizen of the United States through his father's naturalization. On Flag Day, 1914, before the employees of the Department of Interior in Washington, D. C., Lane, then Secretary of the Interior, delivered his famous oration on "Makers of the Flag." He envisioned the flag as the embodiment of the nation's past accomplishments and its future hopes. He saw all Americans as the "makers of the flag":

> The work that we do is the making of the flag.
>
> I am not the flag; not at all. I am but its shadow.
>
> I am whatever you make me; nothing more.
>
> I am your belief in yourself, your dream of what a people may become.
>
> \*    \*    \*    \*    \*    \*
>
> But always I am all that you hope to be, and have the courage to try for.
>
> I am song and fear, struggle and panic, and ennobling hope.
>
> I am the day's work of the weakest man, and the largest dream of the most daring.
>
> I am the Constitution and the courts, statutes and the statute-makers, soldier and dreadnaught, drayman and street sweep, cook, counselor, and clerk.
>
> I am the battle of yesterday and the mistake of tomorrow.
>
> I am the mystery of the men who do without knowing why.
>
> I am the clutch of an idea and the reasoned purpose of resolution.
>
> I am no more than what you believe me to be, and I am all that you believe I can be.
>
> I am what you make me, nothing more.
>
> I swing before your eyes as a bright gleam of color, a symbol of yourself,

the pictured suggestion of that big thing which makes this nation. My stars and stripes are your dream and your labors. They are bright with cheer, brilliant with courage, firm with faith, because you have made them so out of your hearts. For you are the makers of the flag and it is well that you glory in the making.[4]

While he had not known tyranny in the land of his birth, the ennobling thoughts he expressed about the flag are also shared by many millions of our foreign-born citizens who appreciate its myriad blessings from dire personal experience. It may well be that our naturalized citizens are more truly appreciative of the benefits of citizenship under our flag than some of our native-born who do not properly evaluate the worth of their American heritage.

Throughout our history as a nation the flag has been our symbol in many wars, foreign and domestic. It has proudly led our troops in battle and reverently draped the caskets of those who fell. It has signified our national presence on battleships, airplanes, school houses and army forts, and been raised triumphantly in battle on far distant mountain peaks. It was planted on the moon by the Apollo 15 astronauts and one of them, Colonel James B. Irwin, U. S. Air Force, in his historic speech to a Joint Session of Congress on September 9, 1971 said:

> The proudest moment of my life was ·when I saluted our American flag that we had planted on the plain at Hadley-Apennine [on the moon].

117 Cong.Rec.H 8225 (daily ed. Sept. 9, 1971). Even today brave submariners carry it on silent patrol in those dangerous depths beneath the world's seas where with their atomic might they daily preserve the liberty of the free world. It flies over the Nation's Capitol, the Supreme Court, at all our national cemeteries throughout the world and at our Tomb of the Unknown Soldier in Arlington National Cemetery.

---

4. The World Book Encyclopedia 2536 (1958).

Wherever it flies it signifies the presence of the United States of America. To the oppressed and downtrodden of many lands, who yearn for the liberty and freedom of conscience and opportunity that this Nation offers, it is a shining beacon of hope. Today millions of our citizens look upon it with reverence and refer to it affectionately as Old Glory.

However, there are a few who are not appreciative of the blessings it represents, who are intolerant of the finest representative government in the world and who seek to abuse and desecrate the flag because it is our nation's symbol. To prohibit such misuse of the flag every state legislature has enacted laws making flag desecration a criminal offense. On July 5, 1968, Congress enacted a similar statute:

> § 700. *Desecration of the flag of the United States; penalties.*
>
> (a) Whoever knowingly casts contempt upon any flag of the United States by publicly mutilating, defacing, defiling, burning, or trampling upon it shall be fined not more than $1,000 or imprisoned for not more than one year, or both. 18 U.S.C. § 700(a) (1970) (Added by Act of July 5, 1968, Pub.L. 90–381, § 1, 82 Stat. 291).

In doing so Congress was motivated by the same attitudes toward the flag as are held by millions of our citizens and which were so well articulated by President Wilson, Justice Holmes, the Honorable Franklin K. Lane, the Supreme Court and by many others.

## I

### The Charge

By an Information filed in the Court of General Sessions for the District of Columbia appellant Joyce was charged with violating this statute as follows:

> Thomas Wayne Joyce . . . did on or about January 20, 1969 commit the crime of desecrating the flag of the United States, in that he knowingly cast contempt upon a flag of the United States by publicly mutilating, defacing, defiling, burning and trampling upon it,[5] in violation of section 700 of Title 18 [U.S.Code] . . . .

The allegation of the foregoing acts in the conjunctive is the proper way to allege several acts constituting a single offense committed in violation of a single statute. To charge the offense in the disjunctive (as it appears in the strict language of the statute), that the accused did one thing "or" the other, would make the indictment bad for uncertainty, so it is necessary to connect them with the conjunctive "and" before evidence can be admitted as to more than one act. Then a conviction follows if the testimony shows the accused to be guilty of any one of the acts charged.[6] This

---

5. There was no evidence of burning or trampling upon the flag.

6. Turner v. United States, 396 U.S. 398, 420–421, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970), Justice White:

> The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as Turner's indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged. Here the evidence proved Turner was distributing heroin. The status of the case with respect to the other allegations is irrelevant to the validity of Turner's conviction. [Footnote omitted.]

Crain v. United States, 162 U.S. 625, 636, 16 S.Ct. 952, 955, 40 L.Ed. 1097 (1896), Justice Harlan:

> We perceive no sound reason why the doing of the prohibited thing, in each and all of the prohibited modes, may not be charged in one count, so that there may be a verdict of guilty upon proof that the accused had done any one of the things constituting a substantive crime under the statute. And this is a view altogether favorable to an accused, who pleads not guilty to the charge contained in a single count; for a judgment on a general verdict of guilty upon that count will be a bar to any further prosecution in respect of any of the matters embraced by it.

favors the accused for he will be charged with only one offense and a judgment on a general verdict of guilty upon that count will bar further prosecution on all matters alleged therein.

### The Events of Inauguration Day

On Inauguration Day 1969, at about 11:10 A.M. at the corner of 15th Street and Pennsylvania Avenue, N.W. in the District of Columbia, on the route for the Inaugural Parade a short block from the White House grounds, appellant Joyce was standing on the street corner with two women at the rear of a crowd "where everybody was passing by." Many hundreds were standing "five, six, seven . . . deep along the parade route on both sides of the street," (Tr. 29) and there were people all up and down the parade route. The crowd was rowdy, loud and boisterous and were shouting obscenities at the police and National Guard units that were present.

At the aforesaid time and place Joyce was seen by Detective Manning, who was only three or four feet away from him, to tear an American flag (3″ x 5″) off a small flag staff he was carrying, throw the staff to the ground and then tear the flag with his hands. Detective Manning testified as follows:

> He [appellant Joyce] took the flag off the post. He had torn off the post and *thrown it* on the ground. *Then he took the American flag and tore it;* then he folded it longways with the stars up; and with the assistance of one of his lady friends he was with, he tied it to his right index finger, like so (indicating) with the stars up; and he put his hand above his head, straight up with the index and middle finger in a V position and the rest of the fingers pointed down, and waved his hand above his head straight up, back and forth. Then the flag started to come unloose, so he brought it back down, and he tightened it with his teeth; put it back up and did it again. When he brought it back down the second time, I walked up to him, identified myself as a police officer, told him he was under *arrest for mutilating the American flag* . . . .

(Tr. 32, emphasis added.)

Later testimony indicated that Joyce "ripped" the flag from the staff (Tr. 43, 44). The trial court had the benefit of an in-court demonstration by Detec-

---

Wolpa v. United States, 86 F.2d 35, 39 (8th Cir. 1936), Judge Sanborn:

> [I]f the statute denounces several things as a crime, the different things thus enumerated in the statute being connected by the disjunctive "or," the pleader must connect them by the conjunctive "and" before evidence can be admitted as to more than the one act. To recite that the defendant did the one thing *or* another makes the indictment bad for uncertainty. To charge the one thing *and* another does not render the indictment bad for duplicity, and a conviction follows if the testimony shows the defendant to be guilty of either the one *or* the other thing charged. [Citing cases] (Emphasis in the original).

In Rex v. Hunt, 2 Camp. 583 (1811), Lord Ellenborough held:

> If an indictment charges that the defendant did and caused to be done a particular act, it is enough to prove either. This distinction runs through the whole criminal law, and it is invariably enough to prove so much of

the indictment as shows that the defendant has committed a substantive crime therein specified.

Thus, any court is entitled to affirm the conviction on the general finding that appellant "knowingly cast contempt upon the flag by publicly mutilating it."

Street v. New York, 394 U.S. 576, 585–588, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969) is distinguishable. It applies only to a finding of guilty where there are several possible grounds for the verdict, one of which is unconstitutional, and where it is not possible to determine that the verdict was not based on the unconstitutional ground because there was evidence to support a conviction on that ground. However, here all the acts charged in the alternative are equally constitutional and valid and we find that there was adequate proof of at least one of them, *i. e.*, that Joyce knowingly cast contempt by public mutilation of the flag. Tearing the flag also constitutes a "defacing." Thus *Street* is inapposite here.

tive Manning as to how Joyce tore the flag ("Just like this," Tr. 41, 43) and how he tied it to his finger (Tr. 32). Manning further testified that he did not hear Joyce say anything then or later (Tr. 34, 44). Affirmative speech is thus not involved. According to Manning's testimony, the flag was not torn when it was taken off the flag staff, but was torn afterward (Tr. 30, 32). There was likewise no evidence that the flag was torn accidentally or inadvertently, but only that it was purposely torn. There is physical corroboration of this fact by the torn flag which was admitted in evidence, since the tear is parallel to the stripes and the tear begins at that border of the flag which is at the other end away from the blue union where a flag is customarily attached to a staff. The length of the tear was slightly less· than half way across the flag. The location of the start of the tear and its length thus indicates that the tear did not result when the flag was torn or ripped from its staff.

*There was no testimony that appellant tore the flag in order to make it easier to tie the flag to his finger or that the tear was in any way used in doing so.*[7] What testimony there is indicates that after Joyce tore the flag "he folded it longways with the stars up" and then tied it to his index finger. *By folding it longways and tying it in that manner (folded) he rendered the tear useless to aid the tying.* Experiment convinces that the tear could only be used for tying if the flag were not folded when it was tied, *i. e.,* so that the finger would be placed in the crotch of the tear and the two ends used as opposing strands to form the beginning of a knot. There was thus no testimony that the act of tearing the flag was necessary, or was in fact used, to convey the claimed message of "peace."

Joyce took the stand, testified in his own behalf and was evasive as to his reason for tearing the flag. His only response to Detective Manning's testimony that he observed him tear the flag was, "I don't recall the ripping of the flag, but I recall everything else." He said he did remember that the flag had originally been on a short staff; and admitted, in effect, that his acts were not spontaneous or the result of being carried away momentarily, that he had a predetermined intention to appear down at the parade route in order to demonstrate, express some idea, communicate

---

7. The dissent in stating that "the slit having been made to enable the flag to be tied to his finger for the V sign" attempts to supply a reason, outside the record, that Joyce did not give when he had the opportunity to do so. Moreover, the record does not support the statement that appellant made a "slit" to the extent that a slit means a long cut or incision. This mutilation was not performed by cutting but by a forcible tearing. To term the tearing of the flag as a "slit" is to understate the amount of force used according to the record. It states Joyce "had *torn* off the post and thrown it on the ground. . . . Then he took the American flag and *tore* it. . . ." (Tr. 32, emphasis added).

The dissent also states in footnote 3, "I fail to see how this small flag could have been attached to appellant's finger in any manner but with the strips of the tear tied together at their ends." Actually experiment will prove that it is just as easy to tie the flag "folded" (as the testimony indicates was done) as to tie it with the strip ends created by the tear, but what cannot be done is to tie the flag "folded" *and* by the strips. Since the testimony is that Joyce "*folded it* longways with the stars up; and with the assistance of one of his lady friends he was with, he tied it around his right index finger. . . ." (Tr. 32, emphasis added), that disposes of the argument that he used the tear in tying. It also is sufficient to support a finding by the court that Joyce did not tear the flag to enable him to tie it to his finger. Since this is the view of the evidence most favorable to the Government it controls on this appeal. The real defect in the dissent is its unwillingness to recognize the full implications which were indicated by the intentional act of tearing the flag and to consider that view of the evidence most favorable to the Government.

an idea with the flag (Tr. 84).[8] He gave no explanation whatsoever, much less a satisfactory explanation, for his act of tearing the flag and left it for the judge to draw the permissible inference from all the circumstances that Joyce intended by tearing the flag to indicate his contempt for it.

Joyce did describe his display of the flag while wrapped around his right index finger, which was spread away from the adjoining finger to indicate a V sign, as follows:

> By raising my hand in the V sign over my head I was attempting to communicate an idea of peace for both Americans and Vietnamese and the flag was symbolizing the Americans.

This explanation was equivocal in that it failed to describe why it was necessary to have a torn flag to convey this "peace" message and it failed to give any reason for the prior act of tearing (mutilating) the flag, which was the offense for which Detective Manning arrested Joyce.

We also note that Joyce testified that his acts with respect to the flag were intended to convey some message. We find his prior act of tearing the flag (before he used it in the V sign) to be sufficient proof of the offense that he thereby knowingly cast contempt upon the flag by publicly mutilating and defacing it.[9] There is no question that his act of tearing the flag was committed publicly. In fact, it could hardly have been more public, having been done openly in the view of Officer Manning (who observed it) and in the midst of a large crowd "where everybody was passing by,"[10] and hence had an opportunity to observe the acts in question. That the act was committed in a public place, in public view, before members of the public in such manner that the public could have observed the act (and Officer Manning did), is sufficient to satisfy the requirement that the act be committed "publicly." There is also sufficient proof of a public mutilation. The mutilation was proved by the tearing.[11]

8. Q. Did you intend to appear down at the parade route in order to demonstrate, express some idea, communicate an idea?
A. Yes, I was going to communicate an idea with the flag. I wasn't part of the demonstration, though.
Q. When did you decide you wanted to communicate an idea with the flag?
A. I had the idea all the time. As soon as I had the flag I thought of it.
Q. How long had you had the flag?
A. I'm not sure. I got it in the morning.
Q. Approximately how long had you had it in your possession?
A. I don't know. About a half an hour, I guess.
Q. And you decided you were going to do this as soon as you got the flag?
(No response.)
Tr. 84–85.

9. The Senate Report on the bill preceding passage of the act stated:
"Specific examples of prohibited conduct under the bill would include casting contempt upon the flag by * * * *tearing it* * * *." (Emphasis added.)
S.Rep.No.1287, 90th Cong., 1st Sess. 3 (1968). U.S.Code Cong. & Admin.News,

p. 2509. *See* Hoffman v. United States, 144 U.S.App.D.C. ——, 445 F.2d 226 (1971).

10. The trial judge also found that the circumstances constituted a clear and present danger.

11. On cross examination Officer Manning testified:
Q: Detective Manning, the statute that the Court is taking judicial notice of provides that 'Whoever knowingly casts contempt on any flag . . . .' When you arrested the defendant, how did he cast contempt?
MR. EVANS: Objection.
THE COURT: Overruled.
THE WITNESS: In my opinion, as a police officer, by mutilating the flag; and he was desecrating it by wrapping it around his fingers and waving it about his head, above his head in such a manner. [Tr. 51]
* * * * *
Q: What did you mean by "mutilating?" You used that word?
MR. EVANS: Objection.
THE COURT: Overruled.
THE WITNESS: When he tore it. [Tr. 52.]
While the officer's testimony is not controlling on the matter, it is plain that

When all this is added to the unexplained tearing which marred, injured, and disfigured the flag, it was reasonable to conclude that Joyce intended thereby publicly to show his disrespect and scorn for the flag and that he esteemed it to be low and worthless. That is the normal inference from an act of intentionally tearing an article. It is the conclusion that reasonable people reach countless times a day in the activities of ordinary life when they see a person rip something apart, throw part of it to the ground and tear the remainder.

In passing on this matter we recognize that the court may have found that the contempt was partially proved by the demonstrated *manner* in which Joyce *ripped* the flag from its staff, *threw* the staff to the ground and then tore the flag itself. The testimony was not that Joyce *separated* the flag from the staff and *dropped* the staff to the ground and then *slit* the flag. Rather, the testimony indicates acts of more force from which the normal inference would be that the perpetrator intended to express contempt for the article itself. And the force and manner exhibited could have been more accurately portrayed to the court by demonstration. The trial judge who

found Joyce guilty did have the benefit of Manning's reenactment in which he demonstrated the manner in which Joyce performed these acts.

When we pass on the sufficiency of the evidence to support that finding we do not weigh it, but must take the view most favorable to the Government and determine the question of law whether there is substantial evidence, direct or circumstantial, which, together with reasonable inferences that may be drawn therefrom, is legally capable of allowing the trier of fact to be persuaded of guilt.[12] If the evidence so viewed is such that reasonable minds might differ, then the question becomes one of fact for the trier and not one of law to be determined by the court.[13] This rule is equally applicable where the case is tried to the judge without a jury.[14]

■ We conclude from a detailed examination of the entire record that there was substantial competent evidence from which reasonable minds might differ as to the guilt of the accused and hence the decision was for the trier of fact. The court was fully justified on the record here in finding that Joyce publicly mutilated and defaced[15] the flag and knowingly cast contempt[16] upon it. That it

insofar as the contempt was based solely on the charge of "mutilating," the officer reached the opinion at the scene that contempt was demonstrated by the mutilation in the manner and under the circumstances he observed. The additional reference in the officer's testimony to "desecrating it by wrapping it around his finger," etc., does not go to proving contempt *by mutilation.*

12. Etheridge v. United States, 380 F.2d 804, 809 (5th Cir. 1967); Mims v. United States, 375 F.2d 135, 137 (5th Cir. 1967); Wilson v. United States, 118 U.S. App.D.C. 319, 335 F.2d 982 (1963); Beatrice Foods Co. v. United States, 312 F.2d 29, 40 (8th Cir.), cert. denied, 373 U.S. 904, 83 S.Ct. 1289, 10 L.Ed.2d 199 (1963); Jones v. United States, 113 U.S. App.D.C. 352, 353 n. 4, 308 F.2d 307, 308 n. 4 (1962).

13. Isaacs v. United States, 301 F.2d 706, 727 (8th Cir.), cert. denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962).

*See* and *compare,* Brennan v. United States, 240 F.2d 253, 259 (8th Cir.), cert. denied, 353 U.S. 931, 77 S.Ct. 718, 1 L.Ed.2d 723 (1957); Connelly v. United States, 249 F.2d 576, 585 (8th Cir. 1957), cert. denied, 356 U.S. 921, 78 S.Ct. 700, 2 L.Ed.2d 716 (1958); Northcraft v. United States, 271 F.2d 184, 187 (8th Cir. 1959).

14. United States v. Tutino, 269 F.2d 488, 491 (2d Cir. 1959); United States v. Alexander, 219 F.2d 225, 226 (7th Cir. 1955).

15. To mutilate is to render imperfect. To deface is to mar the face, disfigure, injure, destroy, spoil, efface. Webster's Third New International Dictionary.

16. Contempt is defined as a state of mind or condition. It may be evidenced by acts denoting disrespect, disdain or scorn. It also includes that condition of having no respect, concern or regard for something. Webster's Third New International Dictionary.

was only a little flag makes no difference. The statute protects "any flag of the United States." A little American flag is entitled to the same protection as a large one.

Having found that the statute was violated by the physical act of tearing the flag under the attendant circumstances, we do not rely upon the waving of the flag attached to the finger in a V-type gesture in what is alleged to be a "peace" sign as an integral part of the offense. We consider such evidence in its entirety but find nothing in it to explain or excuse the prior misconduct. The judge who conducted the pretrial hearing on the motion to dismiss considered that making the V sign was also contemptuous because it linked the American flag with support for the Viet Cong enemies of our country.[17] So considered, it may have been, but the statute here charged to have been violated proscribes only contempt by a public mutilation, defacing, defiling, burning or trampling. All these prohibited acts constitute conduct involving some physical act directly touching the flag and which are physically destructive of the flag. The subse-

quent act by Joyce of giving the V sign with the flag attached is not an act specifically proscribed by the statute and is only relevant to the extent that it may have indicated Joyce's intent when he tore the flag.[18] In this connection Joyce's failure to explain how the *mutilation* of the flag had any relation whatever to the claimed message of "peace" is a circumstance upon which the court could, together with all the other circumstances, reach a conclusion that his prior act was intentionally contemptuous. We accordingly rest our decision upon the physical act of publicly tearing the flag under the attendant circumstances, the demonstration in court by the officer of the manner in which such act was performed [19] and the normal inference from the act of tearing as described and demonstrated, *i. e.*, that the person thereby indicated his disrespect and contempt for the article torn. On that basis we find the evidence to be sufficient to support the verdict.

## II

Appellant contends that the statute,[20] *first,* is unconstitutionally vague, *second,*

17. THE COURT: . . . Mutilate, under any definition, includes tearing. And the evidence is that he tore the flag in a public place and wrapped it around his hands and apparently sought to support the Viet Cong. Now you say that *those facts alone doesn't go to a jury,* question as to whether he knowingly cast contempt? That is not a question for the fact finder?
Tr. 19.

THE COURT: You mean tearing the flag, wrapping it around your hand and putting it up in a symbol that supports the enemy of our country is not knowingly casting contempt upon it?
Tr. 21.

THE COURT: If you want to support the enemies of our country you don't do it with the flag of the country. Wave the Viet Cong flag. Don't tear up the American flag and support the enemy.

The First Amendment never said you can take the national ensign and mutilate it and use it in a manner to support the enemies of the country.
Tr. 22.

18. The V finger sign formed by spreading the index and adjoining fingers upward was first initiated and popularized by Prime Minister Winston Churchill during World War II to indicate his faith in "Victory for the Allies." Since then other individuals and groups have sought to appropriate it to indicate victory for their side; but the current appropriation of it to mean "peace" has not been such that one can conclude in all circumstances exactly what the user intends. The V sign itself has never acquired any definite meaning other than "Victory." So its meaning is clouded when there is no indication as to what victory the user seeks. If Joyce intended it here to convey a message of peace he did not explain how a mutilated American flag was required in order to communicate that message.

19. *See* United States v. Skinner, 138 U.S. App.D.C. 121, 425 F.2d 552 (1970).

20. 18 U.S.C. § 700 (1970) provides:
   § 700. Desecration of the flag of the United States; penalties.
   (a) Whoever knowingly casts contempt upon any flag of the United

is overbroad, and *third*, that it abridges the First Amendment's guarantee of freedom of speech.

### Vagueness

■ In support of his contention that the statute is unconstitutionally vague appellant points to the requirement of the due process clause of the Fifth Amendment that criminal statutes must provide predictable indicia of guilt so that individuals will have fair notice of the conduct proscribed, Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), and that the standard of clarity is high where First Amendment rights are involved, Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). Building on these guiding principles, with which we agree, appellant then contends that "the essential vice of the statute here under review is its proscription of only those physical acts which intentionally cast

'contempt' upon the flag." [21] In so doing, he makes the point that it is communicative conduct that is proscribed. We will discuss that specific point elsewhere, but appellant's argument in this connection does point up what we believe is a commendable feature of the act, *i. e.*, that it is narrowly drawn to proscribe only those physical acts which may be considered to indicate an intention to cast "contempt" upon the flag.

■■ It is clear that Congress in the statute intended the word "contempt" to be given its ordinary meaning.[22] As such, the word is not imprecise or vague. It means "despise," "to hold in low esteem," "disrespect," "disgrace," "scorn," and "shame," [23] and as so interpreted it would not leave the public uncertain as to what conduct is prohibited. Likewise the words "mutilating, defacing, defiling, burning or trampling" are ordinary words intended to convey their common dictionary meanings.[24]

States by publicly mutilating, defacing, defiling, burning, or trampling upon it shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

(b) The term "flag of the United States" as used in this section, shall include any flag, standard, colors, ensign, or any picture or representation of either, or of any part or parts of either, made of any substance or represented on any substance, of any size evidently purporting to be either of said flag, standard, colors, or ensign of the United States of America, or a picture or a representation of either, upon which shall be shown the colors, the stars and the stripes, in any number of either thereof, or of any part or parts of either, by which the average person seeing the same without deliberation may believe the same to represent the flag, standards, colors, or ensign of the United States of America.

(c) Nothing in this section shall be construed as indicating an intent on the part of Congress to deprive any State, territory, possession, or the Commonwealth of Puerto Rico of jurisdiction over any offense over which it would have jurisdiction in the absence of this section. (Added Pub.L. 90–381, § 1, July 5, 1968, 82 Stat. 291.)

21. Appellant's Brief, at 22.

22. This is the interpretation we placed upon the act in Hoffman v. United States, *supra* note 9, 144 U.S.App.D.C. at —— & n. 8, 445 F.2d at 229 & n. 8.

23. Webster's Third New International Dictionary.

24. H.R.Rep.No.350, 90th Cong., 1st Sess. 7 (1967) states that the words are intended to have the meanings set forth in Webster's Seventh New Collegiate Dictionary. These words of common usage are found regularly in other federal criminal statutes. Acts of defacing are prohibited by 18 U.S.C. § 1164, 7 U.S.C. § 1594 and 26 U.S.C. § 4817(7). Mutilation and defacing are dealt with by 18 U.S.C. §§ 331, 333, 24 U.S.C. § 286 and 31 U.S.C. § 738a deals with both mutilation and defacing. In State v. Schlueter, 127 N.J.L. 496, 499, 23 A.2d 249, 250–251 (1941), the New Jersey Supreme Court upheld a conviction for violation of the state statute for tearing, crumpling and throwing an American flag to the ground, saying:

We understand that the statute, in making it a misdemeanor to deface or to defile the flag, used those words in their meaning of "dishonor." "Dishonor" is purposeful. The word imputes a lively sense of shaming or an equivalent acquiescent callousness. For illustration: A blind man stumbles over

Congress has thus enacted a "precise, narrowly drawn regulatory statute which proscribes certain specific behavior. . . . It prohibits a particular type of conduct . . .." Cox v. Louisiana, 379 U.S. 559, 562, 85 S.Ct. 476, 479, 13 L.Ed.2d 487 (1965); cf. Edwards v. South Carolina, 372 U.S. 229, 236, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). A person of ordinary intelligence from merely reading the statute could easily understand that conduct which involved tearing the flag, such as Joyce engaged in, was prohibited thereby. While stricter than average standards of permissible vagueness may be applied to statutes having a potentially inhibiting effect upon speech,[25] subject to this additional requirement, statutes are not required to be drafted with engineering accuracy but only so as to give fair notice to the average man of common intelligence that specific conduct is proscribed.[26] We find that the statute clearly meets this test. Appellant's brief inquires whether the statute would

> seek to punish those who would mock the design of the flag, or its color combination or shape? Or is the statute directed at those who would criticize the intrinsic value of the flag as a national symbol? Is the mutilation of the flag to demonstrate disagreement with national policies a "contemptuous" mutilation, or is the choice of the flag as the object destined for mutilation merely the use of a convenient symbol to express ideas other than that of disdain for the flag itself?

The answer to all such questions exists in the language of the statute which by its plain terms indicates it is not concerned with prohibiting the communication of any particular idea but only with how the flag is used in so doing. If the circumstances in which the flag is used include the commission in public of one of the acts proscribed by the statute which physically damage the flag so that one can conclude from all the circumstances beyond a reasonable doubt that the perpetrator knowingly cast contempt upon the flag, then such use is prohibited regardless of the ultimate message intended to be communicated. For example, one who said he was attempting only to "mock" the flag, yet who did so by publicly throwing manure upon it, obviously thereby would defile the flag and would violate the statute without regard to his ultimate message. The same could be said of one who attempts to convey a claimed message of "peace" by tearing, burning, manure, etc. It is not the ultimate message of peace that is prohibited but solely the acts which physically damage the flag and thereby can be found to knowingly cast contempt upon it. In addition, since this is a federal act that is to be applied by officers under direct federal control, the federal courts can be assured that the narrow construction we place upon the act will be used in its enforcement and citizens will not be required to go through a lengthy sequence of state court litigation before a proper interpretation is secured.

■ Appellant also contends that the statute invites irrational and selec-

---

the flag and, not knowing what it is, walks upon it and then casts it aside. Has he "trampled" upon the flag? Has he "defaced" or "defiled" it? Has he "dishonored" it? We think not; because those words carry with them, by inherent meaning, an attitude of mind which is wholly lacking in the supposed instance.

25. Cramp v. Board of Pub. Instruction, 368 U.S. 278, 287, 82 S.Ct. 275, 7 L.Ed. 2d 285 (1961); Smith v. California, 361 U.S. 147, 151, 80 S.Ct. 215, 4 L.Ed. 2d 205 (1959); Winters v. New York, 333 U.S. 507, 517, 68 S.Ct. 665, 92 L.Ed. 840 (1948).

26. Sproles v. Binford, 286 U.S. 374, 393, 52 S.Ct. 581, 76 L.Ed. 1167 (1932); Connally v. General Constr. Co., 269 U.S. 385, 391–392, 46 S.Ct. 126, 70 L.Ed. 322 (1926); Nash v. United States, 229 U.S. 373, 377, 33 S.Ct. 780, 57 L.Ed. 1232 (1913); Hoffman v. United States, 256 A.2d 567, 568 (D.C.Ct.App.1969), rev'd on other grounds, 144 U.S.App. D.C. 156, 445 F.2d 226 (1971).

tive patterns of enforcement and is therefore unconstitutional. What is required before a statute will be stricken down on such a claim aimed solely at its facial features is for the act to possess some feature, such as a reasonably imprecise or ambiguous standard, that invites irrational or selective patterns of enforcement, Cox v. Louisiana, *supra*. We do not consider the statute here to be deficient by such test, but rather find that Congress has narrowly defined the conduct proscribed and restricted its application to certain precise acts which would physically damage the flag and be normally indicative of an intent to cast "contempt" upon the flag. Of course, a public official vested with a prosecutorial judgment, or a grand jury, may decline or refuse to prosecute any offense, even though it appears to many to be a clear violation of the statute. Such refusal to prosecute may be proper or improper, but there is nothing about the exercise of such power that makes the statute unconstitutional unless selective or discriminatory enforcement of the act can be justified by the ambiguous or excessively broad language of the statute. However, since we are not here concerned with an imprecise statute and there is no evidence of actual discriminatory or selective enforcement, appellant's argument on this point must fail.

### Overbreadth

The next contention by appellant is that the statute is "overbroad," *i. e.*, that it "sweeps expansively into the area of protected rights where 'the threat of sanctions may deter their [protected rights] exercise almost as potently as the actual application of the sanctions' themselves. N. A. A. C. P. v. Button, 371 U.S. 415, 433 [83 S.Ct. 328, 9 L. Ed.2d 405] (1963)." In support of this

contention it is asserted that "the deterrent effect which the . . . statute exerts upon the exercise of free speech by virtue of the authority it provides for the arrest of those exercising free speech suffices to render the statute unconstitutional."

In reality, appellant's contentions in this regard are based on *his* overly-broad reading of a narrowly-drawn statute. As pointed out elsewhere in this opinion, the statute limits itself to proscribed conduct and does not trespass in the area of speech *per se.*[27] Since conduct alone is proscribed, the statute is not made overly broad by the possibility that the conduct it prohibits frequently may be accompanied by speech, for

[i]t rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.

Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498, 69 S.Ct. 684, 688, 93 L.Ed. 834 (1949).

To the extent that appellant's argument is based on his belief that the statute superficially authorizes arrests for protected activity, we again reiterate that conduct alone is proscribed by the Act's plain terms. That conduct is not described in terms so formless that we are faced with a "statute . . . which readily lends itself to harsh and discriminatory enforcement by . . . officials." Thornhill v. Alabama, 310 U.S. 88, 97–98, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940). *Compare, e. g.*, Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). *See generally* Note, The First Amendment Overbreadth Doctrine, 83

27. Street v. New York, 394 U.S. 576, 590, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969) indicates that words may be relied upon "solely to [prove] intent," but a conviction cannot be based solely on words or jointly on "words and his deed." Justice Black likewise indicated that the statute could validly extend to talking

done as an integral part of proscribed conduct. 394 U.S. at 610, 89 S.Ct. 1354. *Cf.* Justice White's footnote 3, 394 U.S. at 615, 89 S.Ct. 1354; American Communications Ass'n v. Douds, 339 U.S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925 (1950).

Harv.L.Rev. 844, 856–858 (1970). We take it as axiomatic that the statute does not justify arrests for activity which it does not prohibit. Moreover, we can only assume that the Act will be reasonably enforced according to its terms, for use of a contrary assumption as a basis for constitutional analysis would render invalid every criminal statute.

Since the statute defines the proscribed conduct with acceptable precision and since, in the absence of any evidence to the contrary, we are bound to assume that those charged with its enforcement will do so according to its plain terms, appellant's attack must fail. To be sure, situations may arise in which there is some difficulty in determining whether specific activity is, or could constitutionally be, within the sweep of the Act's prohibitions. The fact that marginal situations are bound to exist, however, does not serve to make the Act unconstitutional.[28]

The gist of appellant's argument seems to be that the First Amendment guarantees everyone freedom to desecrate the flag if, in so doing, he intends to convey some idea. As applied here, his argument is that he is protected in his contemptuous tearing of the flag because he was attempting to convey an idea.[29] We deny that the First Amendment goes that far. Mr. Joyce

was free to make any speech he desired but the knowing public contemptuous mutilation of the flag is prohibited by the statute and, in our view, it is not overbroad in that respect.

*Freedom of Speech*

Finally, we consider whether the Flag Desecration Statute as enacted by Congress abridges the freedom-of-speech guarantee of the First Amendment.[30] Before turning to that problem, however, we consider briefly the nature of the power utilized by Congress when it enacted the statute here at issue.

At the outset, we recognize that Congress possesses only certain powers enumerated in the Constitution and that document does not contain any specific grant of power to adopt a national flag or to regulate conduct with respect to it. However, we conclude that the power to enact such legislation is an incident of sovereignty which inheres in the Government of the United States of America as a nation and which the Constitution recognizes and implements. Such legislative power is thus conferred by that broad specific grant to Congress "to make all Laws which shall be necessary and proper for carrying into Execution . . . all . . . Powers vested by this Constitution in the Government of the United States . . .."[31]

28. Jordan v. De George, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951) ; *see* Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913). In Parker v. Morgan, 322 F.Supp. 585 (W.D.N.C.1971) (three-judge court) ; Crosson v. Silver, 319 F.Supp. 1084 (D. Ariz.1970) (three-judge court) and Hodsdon v. Buckson, 310 F.Supp. 528 (D. Del.1970) (three-judge court), the courts held that statutes similar in wording to the former District of Columbia statute, *infra* note 34, were unconstitutionally broad. The differences between such statutes and the one now before us are obvious. Law review commentary on the issues posed by the statutes at issue in *Parker, Hodsdon* and *Crosson* is contained at 12 Ariz.L.Rev. 71 (1970) ; 56 Iowa L.Rev. 615 (1971) ; 1970 Wash.U. L.Q. 517.

29. He does not explain how the mutilation of the flag contributed to that message.

30. The First Amendment provision with respect to free speech provides :
Congress shall make no law . . . abridging the freedom of speech, or of the press ; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

31. Art. 1, § 8 of the U.S. Constitution provides :
The Congress shall have Power . . . To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

With respect to these implied powers which emanate from the framework of our Government and the "necessary and proper" clause, Chief Justice Marshall declared that they embrace "all [legislative] means which are appropriate" to carry out the "legitimate" ends of the Constitution unless forbidden by the "letter and spirit of the constitution." [32] Also, since we are here concerned with the application of the statute within the District of Columbia, it should be noted that, in addition to its implied powers, Congress has all the power of a local and national legislature to legislate for the District.[33] Though neither power permits a violation of the First Amendment, both are sufficiently broad to authorize Congress to legislate with regard to a national flag.[34]

In considering whether the statute is valid under the First Amendment, we first note that it is not directed at speech, but solely at specified conduct.[35] That this is the aim of the Act is made plain both by its terms and by the Senate Report which accompanied it to the floor of that chamber:

The bill does not prohibit speech, the communication of ideas, or political dissent or protest. The bill does not prescribe orthodox conduct or require affirmative action. *The bill does prohibit public acts of physical dishonor or destruction of the flag of the United States.* The language of the bill prohibits intentional, willful, not accidental or inadvertent public physical acts of desecration of the flag. Ut-

---

*See generally* United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 315–318, 57 S.Ct. 216, 81 L.Ed. 255 (1936); McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 411–412, 4 L.Ed. 579 (1819); United States v. Ferguson, 302 F.Supp. 1111, 1114 (N.D.Calif.1969).

32. McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819).

33. Art. 1, § 8 of the U.S. Constitution provides:
> The Congress shall have Power . . To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States . . . .

In legislating for the District of Columbia, Congress possesses all the powers of a local and national legislature. Kendall v. United States, on relation of Stokes, 37 U.S. (12 Pet.) 524, 619, 9 L.Ed. 1181 (1838):
> There is, in this district, no division of powers between the general and state governments. Congress has the entire control over the district, for every purpose of government . . . .

Stoutenburgh v. Hennick, 129 U.S. 141, 147, 9 S.Ct. 256, 257, 32 L.Ed. 637 (1889):
> Congress has express power "to exercise exclusive legislation in all cases whatsoever" over the District of Columbia, thus possessing the combined powers of a general and of a State

government in all cases where legislation is possible.

*Accord,* Shoemaker v. United States, 147 U.S. 282, 300, 13 S.Ct. 361, 37 L.Ed. 170 (1893); Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 434–435, 52 S.Ct. 607, 76 L.Ed. 1204 (1932); O'Donoghue v. United States, 289 U.S. 516, 539, 53 S.Ct. 740, 77 L.Ed. 1356 (1933); Bradshaw v. United States, 143 U.S.App.D.C. 344, 349, n. 11, 443 F.2d 759, 764 n. 11 (1971).

34. Prior to passage of the instant Act, Congress had enacted a statute applicable only to the District of Columbia which provided in pertinent part:
> Any person . . . who, within the District of Columbia, shall publicly mutilate, deface, defile or defy, trample upon or cast contempt, either by word or act, upon [the flag of the United States] shall be deemed guilty of a misdemeanor . . . .

Act of February 8, 1917, ch. 34, 39 Stat. 900, 22 D.C.Code § 3414 (1967). When the instant statute was passed, the above language was deleted from the District statute so that the Federal law now applies to the States and the District alike. Act of July 5, 1968, Pub.L.No. 90–381, § 3, 82 Stat. 291.

35. The original bill in Congress contained a provision prohibiting flag desecration by words but such provision was deleted upon advice of the Attorney General of the United States. *See* H.R.Rep.No. 35, 90th Cong., 1st Sess. 7 (1967).

terances are not proscribed. Specific examples of prohibited conduct under the bill would include casting contempt upon the flag by burning or *tearing it* and by spitting upon or otherwise dirtying it. There is nothing uncertain or vague about the terms used in the bill.[36]

Moreover, neither the charge against appellant nor the evidence introduced at trial dealt with any oral statement made by him in connection with the offense.

We are not, therefore, concerned with pure speech or with any combination of pure speech and conduct. *Compare* Bachellar v. Maryland, 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970); Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969). The question thus becomes whether the statute deals with matters so intertwined with speech that it cannot constitutionally stand. *Cf.* Cowgill v. California, 396 U.S. 371, 90 S.Ct. 613, 24 L.Ed.2d 590 (1970) (Harlan, J., concurring).

While recognizing that the First Amendment's protections apply to certain non-verbal conduct of a communicative nature [37] we also recognize that it is now clear that the communication of ideas by conduct is not guaranteed the same degree of protection accorded communication by pure speech.[38] The difference in treatment afforded speech as distinguished from physical acts is, in part, a recognition of the fact that there are certain fundamental differences between the two. Speech is the traditional instrument of peaceful persuasion, the means traditionally used to convert people to a different point of view and, as such, is the very lifeblood of any free democracy. Untrammeled freedom of speech is particularly essential in a republican form of government, such as ours, where there is a need to inform vast multitudes of citizens on the most complex problems which confront their national representatives. It has been said that

> a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.

Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949). Indeed, the freedom of speech guaranteed by the First Amendment is crucial to the continuation of our form of government.

Physical acts, however, differ from pure speech. While speech invites discussion, counter-speech and eventual agreement, public acts often have a certain finality about them which is frequently so conclusory and provocative as to be destructive of that rational discourse which we consider to be so essential to the continuing vitality of the Nation. Of course, speech can also be provocative but it provokes a response in kind rather than those which tend to fill

---

36. S.Rep.No.1287, 90th Cong., 1st Sess. 3 (1968) (emphasis added).

37. Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 505, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Brown v. Louisiana, 383 U.S. 131, 141–142, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); *see* Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

38. Cox v. Louisiana, 379 U.S. 536, 555, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949); United States v. Miller, 367 F.2d 72, 79 (2d Cir. 1966), cert. denied, 386 U.S. 911, 87 S.Ct. 855, 17 L.Ed.2d 787 (1967). In *Giboney,* Justice Black, speaking for the Court, stated:

> [I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.

336 U.S. at 502, 69 S.Ct. at 691.

the marketplace of ideas with the sound of thudding fists.

For these and other reasons, the adjudicated cases interpreting the First Amendment have held that certain public conduct is subject to regulation even though it is related to expression.[39] In Cox v. Louisiana, *supra*, 379 U.S. at 555, 85 S.Ct. at 464, for example, the Supreme Court stated:

> We emphatically reject the notion * * * that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech.

More recently, in United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 1678–1679, 20 L.Ed.2d 672 (1968), Chief Justice Warren remarked:

> This Court has held that when "speech" and "nonspeech" elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinat-

ing; paramount; cogent; strong. [Footnotes omitted] Whatever imprecision inheres in these terms, we think it clear that a governmental regulation is sufficiently justified if it is within the constitutional power of the government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.[40]

▇▇▇▇▇ We thus consider the constitutionality of the statute under the standards applicable to those laws which prohibit specific acts, including acts constituting communicative conduct, and not by the standards applicable to those laws which are directed at speech *per se*. To meet the test of these cases, we hold that the United States does have a substantial, genuine and important interest in protecting the flag from public desecration.[41] This interest is a reflection of the interest which the people of the United States have manifested, through their representatives, in having a symbol to represent them as a nation; for the power of the Government to further the people's interest by designating the flag as the Nation's symbol also implies the power to protect it against public acts which physically damage and degrade it.[42]

39. *See, e. g.,* Shuttlesworth v. City of Birmingham, 394 U.S. 147, 152, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Walker v. City of Birmingham, 388 U.S. 307, 315–316, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967); Cox v. Louisiana, 379 U.S. 536, 555, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 497–498, 69 S.Ct. 684, 93 L.Ed. 834 (1949); Schneider v. State, 308 U.S. 147, 160–161, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

40. In United States v. Ferguson, 302 F. Supp. 1111 (N.D.Calif.1969), the court held that the Federal Flag Desecration Statute was constitutional under the principles announced in *O'Brien.* While we agree with the result reached in *Ferguson,* we cannot subscribe fully to the

reasoning there used, nor do we believe that the above-quoted "test" in *O'Brien* provides a solution for all First Amendment problems. The particular acts allegedly carried out as well as the specific features of each statute must be considered in light of whatever constitutional limitations are applicable.

41. *See* United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 20 L.Ed. 2d 672 (1968).

42. While it may be true that Congress, when acting as a national legislature, has no police powers equivalent to those possessed by the states, Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 156, 40 S.Ct. 106, 64 L.Ed. 194 (1919); *see* Speert v. Morgenthau, 73 App.D.C. 70, 74, 116 F.2d 301, 305

From early on, the place of symbols in the functioning of nations has been recognized. For example, Justice Harlan, in Halter v. Nebraska, 205 U.S. 34, 41, 27 S.Ct. 419, 421, 51 L.Ed. 696 (1907), stated:

From the earliest periods in the history of the human race, banners, standards and ensigns have been adopted as symbols of the power and history of the peoples who bore them. It is not then remarkable that the American people, acting through the legislative branch of the Government, early in their history, prescribed a flag as symbolical of the existence and sovereignty of the Nation. Indeed, it would have been extraordinary if the Government had started this country upon its marvelous career without giving it a flag to be recognized as the emblem of the American Republic. For that flag every true American has not simply an appreciation but a deep affection. No American, nor any foreign born person who enjoys the privileges of American citizenship, ever looks upon it without taking pride in the fact that he lives under this free Government. Hence, it has often occurred that insults to a flag have been the cause of war, and indignities put upon it, in the presence of those who revere it, have often been resented and sometimes punished on the spot.

In addition, we are not faced with a statute in which Congress has made criminal the peaceful expression of unpopular views. Compare Edwards v. South Carolina, supra, 372 U.S. at 237, 83 S.Ct. 680. Rather the statute proscribes certain distinctive acts whether they are associated with any particular expression of views which may be popular or unpopular with any group or individual. Distinguishable, then, are cases such as Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) and Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 510–511, 89 S.Ct. 733, 21 L.Ed. 2d 731 (1969) where purported regulation of conduct was in reality little more than an attempt to suppress a particular communication protected by the First Amendment. See also Schacht v. United States, 398 U.S. 58, 62–63, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970).

Dissenting in Street v. New York, supra, 394 U.S. at 616–617, 89 S.Ct. at 1378, Justice Fortas referred to the flag as "a special kind of personalty. * * * property, in a sense; but * * * property burdened with peculiar obligations and restrictions." [43] Because of the unique status of the flag as the visi-

---

(1940), it does have such powers when legislating for the District. See note 33, supra, and accompanying text. Insofar as the statute here under consideration is applicable to the District of Columbia, then, we also hold that the Congress has a valid and substantial interest in preventing the serious public disorders which flag desecration is almost certain to engender. See Street v. New York, 394 U.S. 576, 592, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); Williams v. District of Columbia, 136 U.S.App.D.C. 56, 64, 419 F.2d 638, 646 (1969) (en banc). Compare Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). As our above discussion indicates, the statute is drawn with precision sufficient to promote that interest

while not "unduly . . . impair[ing] liberty of expression." Chaplinsky v. New Hampshire, supra, 315 U.S. at 574, 62 S.Ct. 766. Compare Crosson v. Silver, 319 F.Supp. 1084, 1088–1089 (D. Ariz.1970) (three-judge court).

43. Similar views were expressed by Chief Justice Warren and Justice Black, in their respective dissents. Chief Justice Warren stated:
I believe that the States and the Federal Government do have the power to protect the flag from acts of desecration and disgrace.
Street v. New York, supra, 394 U.S. at 605, 89 S.Ct. at 1372. Justice Black stated:
It passes my belief that anything in the Federal Constitution bars a State from making the deliberate burning of the American flag an offense.
Id. at 610, 89 S.Ct. at 1374. In other cases a similar view has been expressed.

990

ble embodiment of the Nation, Congress has the power, at the very least, to prevent those who own it from knowingly and publicly utilizing it so as to cast contempt upon it in a host of ways in which similar pieces of cloth not impregnated with the Nation's emblem might be used. Prohibition of such uses is a reasonable method of protecting the Nation's symbol and places only the smallest, if any, obstacle in the path of free discourse. As stated in the Senate Report on the bill:

> Public burning, destruction, and dishonor of the national emblem inflicts an injury on the entire Nation. Its prohibition imposes no substantial burden on anyone. U.S.Code Cong. & Admin.News, p. 2509.[44]

Since the Act is not aimed at the suppression of speech, and since it imposes only the smallest restraints on "communication," the fact that those who utilize the flag in a prohibited manner do so with the purpose of conveying a particular idea is irrelevant. Giboney v. Empire Storage & Ice Co., *supra*. As was stated in the recent case of Parker

v. Morgan, 322 F.Supp. 585, 590 (D.N.C. 1971):

> No man can be punished for refusal to affirmatively demonstrate respect for the flag, nor can anyone be punished for speaking contemptuously of the flag, whether by word or gesture; but the legislature may constitutionally, whether wisely or foolishly, make it criminal to willfully and knowingly cast contempt upon the flag by public acts of physical contact such as mutilation, defiling, defacing or trampling.

We conclude, therefore, that the statute is constitutional as enacted and as applied. Accordingly, the judgment is

Affirmed.

FAHY, Senior Circuit Judge (concurring in part, dissenting from affirmance):

I agree that the federal statute, providing for fine or imprisonment or both, for "[w]hoever knowingly casts contempt upon any flag of the United States by publicly mutilating, defacing, defiling, burning or trampling upon it," is constitutional in its subparagraph(a).[1]

---

Thus in Hoffman v. United States, 256 A.2d 567, 569 (D.C.Ct.App.1969), rev'd on other grounds, 144 U.S.App.D.C. 156, 445 F.2d 226 (1971), the court stated:
> Surely the Government has a substantial, genuine and important interest in protecting the flag from public desecration by contemptuous conduct.

Likewise, in Hinton v. State, 223 Ga. 174, 154 S.E.2d 246, 249 (1967), the court said:
> The basis of [the] decision [in Halter v. Nebraska, *supra*] was the right of the people to protect such flag from disrespectful conduct and insults.

Finally, in Parker v. Morgan, 322 F. Supp. 585, 587 (D.N.C.1971) (three-judge court), the court said:
> We believe the flags of the United States of America and the State of North Carolina to be sui generis. In our opinion the Congress of the United States is constitutionally empowered to reasonably regulate display of the national emblem, and may constitutionally permit the states also to reasonably regulate such display.

Schacht v. United States, 398 U.S. 58, 62, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970),

does not lead to a different conclusion. The statute there involved permitted actors to wear the uniform of an armed service provided that the actor's portrayal did not tend to discredit that service. 10 U.S.C. § 772(f) (1964). The court held, in effect, that the statute was overly broad because it permitted an actor to be convicted if he *said* things during the portrayal that tended to cast aspersions on the armed service in question. Apart from the differences between *a* uniform of *an* armed force and *the* flag of *the* United States, we are here faced with no statute which would permit a conviction for speech.

44. S.Rep.No.1287, 90th Cong., 2d Sess. 3 (1968).

1. I do not consider the constitutional question whether the Congress may, as it has attempted to do, define as the flag of the United States for purposes of the statute, the various semblances of the flag referred to in subparagraph (b) of the statute. *See* Parker v. Morgan, 322 F.Supp. 585 (W.D.N.C.1971); *cf.* Hoffman v. United States, 144 U.S.App.D.C. 156, 159 n. 9, 445 F.2d 226, 229 n. 9.

*See* Hoffman v. United States, 144 U.S. App.D.C. 156, 157, 445 F.2d 226, 228–229 (1971). I also join in the court's opinion in its outline of the history of our flag, the tributes to it, and the place it should occupy in our affection and respect. As to affirmance of appellant's conviction, however, I respectfully dissent, for the reason that there was lack of sufficient evidence that his conduct was accompanied by a knowing casting of contempt upon the flag.

The flag was about 4 by 6 inches in size. Appellant had come to the Avenue for the Inaugural Parade, accompanied by a young lady and joined by another. They were standing on the sidewalk, at the rear of a crowd, five, six or seven people deep. Some of the people near appellant were shouting and protesting. The atmosphere was emotional. Appellant responded to the excitement in his own way. He silently undertook to use the flag as part of a V sign. In doing so he created no disturbance whatever.

When he was asked at trial what idea he intended to convey by his actions with the flag, he replied:

> By raising my hand in the V sign over my head I was attempting to communicate an idea of peace for both the Americans and Vietnamese, and the flag was symbolizing the Americans . . . . The Americans, The American government.

When pressed on cross-examination why he found it advisable at the particular time, in order to communicate this idea of peace, to take the flag from its post, put it on his finger, and raise his arm above his head, he responded:

> Why did I do this? It was meaning peace, and it's [sic] two sides; right? One could be the American and one could be the Viet Cong. I was symbolizing that by the flag, like I said before.

The subject being further pursued, he responded:

> I was symbolizing America. I was not one of the demonstrators. It was my own idea.
>
> \* \* \* \* \* \*
>
> I was not with any organized groups. I came up here with one girl to meet some friends.
>
> \* \* \* \* \* \*
>
> Yes, I was going to communicate an idea with the flag. I wasn't part of the demonstration, though.

If this testimony is accepted—and I do not know why it should not be accepted, for his conduct is not inconsistent with it—appellant did not knowingly cast contempt upon the flag by a public mutilation of it. When appellant removed the flag from the rod and made the slit, the officer said he did not then arrest him, indicative to some degree that thus far there had been no knowingly contemptuous mutilation.[2] The slit having been made to enable the flag to be tied to his finger for the V sign,[3] I have a serious problem in find-

---

2. The arresting officer testified as follows:

> Q. What first focused your attention on Mr. Joyce?
>
> A. When he took the flag off its holder.
>
> Q. But you didn't arrest him then, did you?
>
> A. No, sir.
>
> Q. So, you didn't feel that violated the statute, did you?
>
> A. Not at the time.

It appears that the court sustained a motion to strike the last question and answer, notwithstanding argument of counsel to the contrary.

3. The opinion of the court would have us conclude that the slit in the flag was not made to enable appellant to tie it to his index finger. The court says that "[b]y folding it longways and tying it in that manner (folded) he rendered the tear useless to aid the tying." P. 978 *supra.* Such a conclusion is I think untenable. Detective Manning testified that appellant "tightened it [the flag] with his teeth." I fail to see how this small flag could have been attached to appellant's finger in any manner but with the strips of the tear tied together at their ends. In any event, the sequence of events clearly points to the tearing of the flag being to enable it to be used

ing that in making the V sign in this manner to symbolize peace and America, appellant knowingly cast contempt upon the flag by mutilating it.

The opinion of the court seems not to consider appellant's making of the V sign in determining whether he knowingly cast contempt upon the flag. Such an approach ignores the circumstantial character of proof which was relied on in determining whether appellant's conduct amounted to contempt of the flag. Appellant's conduct must be considered as a whole. When so considered, together with his explanations, it seems clear that if the trial court could find that appellant's conduct was contemptuous of something, his undisclosed contempt was not directed toward the flag, as it must be to come within the statute.[4]

The statute also requires for conviction that a person "knowingly" cast contempt upon the flag by one of several enumerated acts. Unless the word "knowingly" is surplusage, an assumption I cannot make, it requires not only that a court find that appellant cast contempt on the flag, but also that it find that appellant himself was aware he was casting such contempt on the flag by his acts.[5] There can be little doubt, it seems to me, that appellant was not aware he might be casting contempt upon the flag.

It is questionable, finally, whether appellant's tearing of the flag should be said to have been a "public" mutilation. When appellant made the slit he was holding the flag between his waist and shoulders. In addition, Detective Manning testified that he did not know and could not say whether anybody was looking at appellant when he made the

tear. *See* Street v. New York, 394 U.S. 576, 599, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969) (Warren, C. J., dissenting); *id.* at 589 n. 10, 89 S.Ct. 1354 (opinion of Court).

For the reasons stated I would reverse appellant's conviction. The line that must be drawn in cases of this sort is sometimes difficult. When it is remembered, however, that the statute was intended to be construed narrowly to avoid possible conflict with freedoms protected by the First Amendment, *see* Hoffman v. United States, *supra,* appellant's conduct ought not be placed on the criminal side of the line, as if justified by proof beyond a reasonable doubt of the essential elements of the crime.

I respectfully dissent from affirmance of the conviction.

---

as an integral part of a V sign. Finally, I search the record in vain for a finding of the trial court to support the majority's inferences from the facts.

4. Concededly appellant might have expressed the idea he had by other means. That is not the question before us. There was excitement in the crowd, and in the midst of all the emotion appellant chose the means already described.

5. The Model Penal Code, § 2.02(2) (b), ALI, Proposed Official Draft (May 4, 1962), provides that "[a] person acts knowingly with respect to a material element of an offense when: (i) if the element involves the nature of his conduct . . . he is aware that his conduct is of that nature . . . ." *See* Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).