**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Sharon K. CROSSON, Defendant-Appellant.**

**No. 71-2049.**

United States Court of Appeals, Ninth Circuit.

May 26, 1972.

Rehearing In Banc Denied July 28, 1972.

W. Edward Morgan (argued), Tom R. Clark (argued), of Mesch, Marquez & Rothschild, Tucson, Ariz., for defendant-appellant.

Ann Bowen, Asst. U. S. Atty. (argued), Richard K. Burke, U. S. Atty., for plaintiff-appellee.

Erik M. O'Dowd, of O'Dowd, Fahringer & Diamos, Tucson, Ariz., amicus curiae for American Civil Liberties Union.

Before BROWNING, KILKENNY and TRASK, Circuit Judges.

KILKENNY, Circuit Judge:

Appellant was indicted, tried by a jury and convicted of publicly burning the flag of the United States in violation of 18 U.S.C. § 700. She was sentenced to imprisonment for a period of four months and fined.

## FACTS

While there is some dispute as to the facts, the jury, in order to convict, must have accepted the government's version briefly outlined in the following narrative.

Two undercover agents of the Arizona Department of Public Safety joined a group of war protestors consisting mainly of University of Arizona students. This occurred on May 6, 1970. The agents, upon return of the protestors to the campus from downtown Tucson, proceeded to the second floor of the R. O. T. C. Building, known as "Old Main", where fifty to seventy-five persons had gathered. Shortly thereafter, one of the agents observed appellant entering the building with another girl. The girls were carrying an American flag. Upon reaching the group, the appellant uttered a very unladylike expression, threw the flag on the floor, and sprayed it with a fluid from a yellow can. Several of those gathered then held up the flag, appellant again sprayed it, borrowed and lit a match and threw it on the flag causing the latter to burn. Later, several other bystanders also tossed lighted matches on the flag. One of the participants picked up the remnants of the flag with a stick and carried it from the building. The flag measured approximately four feet in width by six feet in length, had seven red and six white stripes, a field of blue with fifty, five-pointed stars.[1] Appellant presented several witnesses who testified that she remained outside the building during the entire affair. Obviously, the jury resolved this issue against her.

## CONSTITUTIONAL CHALLENGES

A threshold question presented for decision is the constitutionality of 18 U.S. C. § 700(a) (b), quoted in pertinent part in the footnote.[2] The only item of the legislation with which we are here concerned is a flag.

## POWER OF CONGRESS

The main thrust of appellant's argument is that authorization for this type of legislation cannot be found in any of the enumerated or implied powers of the Constitution, Article I, Section 8.

We start with the premise that it is our duty to uphold, if possible, the constitutionality of the legislation. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

Early in the history of our nation, the Supreme Court spoke on the powers necessarily implied and those expressly granted. We are told that in construing the Constitution, we must accept as a tenet the proposition that the implications of the express language are as much a part of the instrument as that which is expressed. Beyond that, we are taught that this principle, in its application to the Constitution, more than almost any other writing, is a necessity, by reason of the inherent inability to put into words all derivative powers—a difficulty clearly recognized by the Constitution itself when it conferred on Congress the authority to pass all laws nec-

---

1. 4 U.S.C. §§ 1, 2.

2. 18 U.S.C. § 700. *Desecration of the flag of the United States; penalties*
   "(a) Whoever knowingly casts contempt upon any flag of the United States by publicly . . . burning, . . . shall be fined not more than $1,000 or imprisoned for not more than one year, or both.
   "(b) The term 'flag of the United States' as used in this section, shall include any flag, . . . of any size evidently purporting to be . . . said flag, . . . of the United States of America, . . . ."

essary and proper to carry into execution the powers expressly granted and all other powers vested in the government or any branch of it by the Constitution. Ex parte Yarbrough, 110 U.S. 651, 658, 4 S.Ct. 152, 28 L.Ed. 274 (1884); South Carolina v. United States, 199 U.S. 437, 451, 26 S.Ct. 110, 50 L.Ed. 261 (1905).

Even at an earlier date, the Supreme Court recognized that it would be a most unreasonable construction of the Constitution which would deny to the government created by it, the right to freely employ every means, not prohibited, necessary for its preservation. Legal Tender Cases, 12 Wall 457, 79 U.S. 457, 534, 20 L.Ed. 287 (1871).

■ We need only look to Article I, Section 8, to find grants of express power which we hold necessarily include implied power to legislate on the subject before us. Manifestly, the power to: (1) regulate commerce with foreign nations; (2) raise and support armies; (3) provide and maintain a navy; (4) provide for calling forth the militia; (5) establish a uniform rule of naturalization; (6) declare war; (7) provide for organizing, arming and disciplining the militia; (8) make rules for the regulation of the land and naval forces, when read in the light of the powers granted in the concluding paragraph of Section 8, to-wit: "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof", includes the power to legislate upon the subject of and adopt a national flag.

That the existence of a national flag was considered of great significance to the members of the Continental Congress [3] is demonstrated by the adoption on June 4, 1777, of a national flag.[4]

The Supreme Court has said that the flag is the symbol of the nation's power,

the emblem of freedom in its truest and its best sense, and that to all lovers of the country the flag signifies government resting on the consent of the governed; liberty regulated by laws; protection of the weak against the strong; security against the exercise of arbitrary power and absolute safety for free institutions against foreign aggression. Halter v. Nebraska, 205 U.S. 34, 43, 27 S.Ct. 419, 51 L.Ed. 696 (1907). The first legislation defining the flag, following the adoption of the Constitution, was the Act of January 13, 1794, 1 Stat. 341(c)1. For our purposes, the language of this legislation was identical with the language of the resolution of the Continental Congress, except that the Act provided for 15 stars, rather than the 13, mentioned in the resolution. The concern of the Congress with the flag's place in the national picture is again demonstrated by the legislation with reference to Flag Day, 36 U.S.C. § 157, National Flag Week, 36 U.S.C. § 157a and numerous holidays on which the flag must be displayed, 36 U.S.C. § 9. Beyond that, the national concern is evinced by the legislation, 36 U.S.C. § 176, requiring respect for the flag.

We take judicial notice of the use of a flag as a representative national emblem of organized government for many centuries prior to the adoption of our Constitution and hold that in the light of our history and the express and implied power granted under Article I, Section 8, that the Congress had the power to enact the challenged legislation.

Our conclusions on this challenge find full support in Hoffman v. United States, 144 U.S.App.D.C. 156, 445 F.2d 226 (1971); Joyce v. United States, 454 F.2d 971 (D.C.Cir., 1971).

## VAGUENESS AND OVERBREADTH

These issues were raised in appellant's motion to dismiss and quash the indictment and are now argued together. En-

---

3. A large number of whom were framers of the Constitution.

4. 8 Journal of the Continental Congress 464.

twined with the argument is a discourse on First Amendment rights.

It is argued that 18 U.S.C. § 700(a) makes it a crime for burning a flag, while 36 U.S.C. § 176(j) authorized burning of the same flag. The distinction lies in the purpose and intent of the actor. The flag may be destroyed under § 176(j) only when it is in "such condition that it is no longer a fitting emblem for display", while § 700(a) requires the actor to cast "contempt" upon the flag by publicly burning it. True enough, as argued by the appellant, the impression of the picture of a president or the Seal of the United States on a flag might "deface" it, but such an impression or superimposition could not be viewed as casting "contempt" upon a flag. The suggestion of Amicus that writing the language, "I love this country" across the flag would "deface" it just as effectively as writing "I hate this country" upon the flag. The argument is specious. Of course, no "contempt" for the flag could be drawn from the use of the former.

■■■ We must presume that the Congress used the word "contempt" in its usual and settled sense. United States v. Stewart, 311 U.S. 60, 61 S.Ct. 102, 85 L.Ed. 40 (1940), rehearing denied 311 U.S. 729, 61 S.Ct. 390, 85 L.Ed. 475 (1940); Banks v. Chicago Grain Trimmers Assn., 390 U.S. 459, 88 S.Ct. 1140, 20 L.Ed.2d 40 (1968); rehearing denied 391 U.S. 929, 88 S.Ct. 1800, 20 L.Ed.2d 671 (1968); Malat v. Riddel, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966). Turning to Webster's New International Dictionary, 3d Edition, we find the common definition of the word "contempt" to mean: "despise", "to hold in low esteem", "disrespect", "disgrace", "scorn" and "shame". As so interpreted and used in the context of the language of the statute, the public can have no doubt as to what acts are illegal. Certainly, there is no doubt as to what is meant by "contempt". Although recognizing, as we do, that statutes having a potentially chilling effect upon freedom

of speech, must withstand stricter than average standards of permissible vagueness. Smith v. California, 361 U.S. 147, 151, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); Winters v. New York, 333 U.S. 507, 517, 68 S.Ct. 665, 92 L.Ed. 840 (1948). We have no difficulty in holding that a person of commonplace mental capacity from a mere reading of the statute could readily comprehend that conduct which involved deliberately burning a flag was beyond the pale. It is only necessary that the statute have such precision as to give fair notice to the average man that specific acts are prohibited. Other arguments presented by appellant and Amicus have received our attention, but do not merit discussion. The contumacious act of burning prohibited by the statute is clear, rather than vague. One conclusion is limited to the burning of a *flag* under § 700(a) and the definition in § 700(b), rather than additional items attempted to be covered by ". . . standard, colors, ensign, or any picture or representation of either, or of any part or parts of either, made of any substance or represented on any substance, . . ." Such items are not here under scrutiny.

■■■ We next approach appellant's claim that the statute is overbroad and infringes upon her constitutionally protected First Amendment rights. She claims that the flag burning was part of a protest against this country's involvement in the Viet Nam War. Conceding that non-verbal expression, such as here involved, may be a form of free speech within the meaning of the First and Fourteenth Amendments, Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), we also must recognize that freedom of speech, although to be specially guarded, is not absolute and the power to regulate First Amendment rights is within the constitutional power of Congress. See United States v. O'Brien, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968), where Chief Justice Warren, in passing

on First Amendment rights in connection with burning of a draft card, said:

"We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea. However, even on the assumption that the alleged communicative element in O'Brien's conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity. This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms. To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. [Footnotes omitted]. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."

Now, with reference to the O'Brien tests, we have already crossed the first

bridge and held that the Congress had power to enact the legislation.

Already mentioned is the fact that even before the adoption of the Constitution, we had already selected and legislatively described in detail a National Flag. Throughout our history, the flag has been the centerpiece, one might say the altar, of our national holidays and celebrations, and those living at the time will never forget the national pride and jubilation in the closing days of World War II, upon viewing the picture of those gallant servicemen raising the flag on Mt. Suribachi while under the steady fire of enemy snipers in the then hell hole of Iwo Jima. What adult doesn't recall the patriotic lines he recited during his childhood: "Shoot if you will this old gray head, but save your country's flag, she said", or remember standing stiffly at attention on hundreds of occasions to the gripping strains of the National Anthem, The Star Spangled Banner. The government has power to select a flag and legislate as to its display. Inherent in that power would be a legitimate government interest in prohibiting the contumacious destruction of that flag.

■ We now approach the third test. Is the governmental interest unrelated to the suppression of free expression? We believe the congressional history of the enactment and, in particular, Senate Report No. 1287,[5] makes it abundantly clear that the Congress was in no way attempting to interfere with free speech. Indeed, it is obvious that § 700 was enacted to put an end to a number of "recent public flag-burning incidents in various parts of the United States and

---

5. "The committee believes that H.R. 10480 will successfully withstand all constitutional challenges to which it may be subjected in the courts. The bill does not prohibit speech, the communication of ideas, or political dissent or protest. The bill does not prescribe orthodox conduct or require affirmative action. The bill does prohibit public acts of physical dishonor or destruction of the flag of the United States. The language of the bill prohibits intentional, willful, not accidental or inadvertent public physical acts of desecration of the flag. Utterances are not proscribed. Specific examples of prohibited conduct under the bill would include casting contempt upon the flag by burning or tearing it and by spitting upon or otherwise dirtying it. There is nothing vague or uncertain about the terms used in the bill." U.S.Code Congressional and Administrative News, Vol. 2, 90th Cong., 2d Sess., pp. 2507, 2509 (1968); S.Rep. No. 1287.

foreign countries by American citizens." The Congress specifically disclaimed any intent to "prohibit speech, the communication of ideas or political dissent or protest." The report further emphasized that "The Bill does not prescribe orthodox conduct or require affirmative action." Moreover, "utterances are not proscribed." Manifestly, the legislation was enacted to prohibit the physical act of contemptuously burning a flag, rather than to in any way suppress free speech.

We have no difficulty with the final O'Brien test. Clearly, the restriction on appellant's First Amendment freedoms is no greater than is essential to the furtherance of the national interest. She has not been deprived of a forum for expressing her dissent, but rather denied the use of the flag for contemptuous physical destruction.

▪ This brings us to the issue of whether the statute was unconstitutionally applied to appellant. We have previously discussed most of appellant's arguments on this particular issue. The fact that the burning occurred in a university building, presumed to be an open forum for the exchange of ideas, does not remove appellant from the effect of the statute. The burning occurred in a public area and the jury found it constituted a deliberate and contemptuous act on the part of appellant. The fact that appellant may have intended an expression of protest over the Viet Nam War is of no significance.

We find that § 700(a) (b) meets all of the requirements outlined in the O'Brien decision and that appellant was constitutionally convicted of violating its provisions.

Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969), is readily distinguishable. There, the state statute made it a crime: "publicly [to] defy . . . or cast contempt upon [an American flag] *by words* . . ."

[Emphasis supplied.] The court specifically declined to reach the constitutional issues other than presented by the quoted language. On page 581, 89 S.Ct. page 1360, it is said ". . . we resist the pulls to decide the constitutional issues involved in this case on a broader basis than the record before us imperatively requires."

▪ The Arizona statute before the three-judge court in Crosson v. Silver, 319 F.Supp. 1084 (D.Ariz.1970), used language similar to that before the Supreme Court in *Street*, and, for that reason is subject to the same distinction. What was said by that court on destruction by act amounting to "symbolic speech" was unnecessary to the decision and, in any event, is not binding upon us.

Other authorities cited by appellant, such as Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); West Virginia State Board of Education v. Barnette, 319 U.S. 624, 641–642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943); Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); and Stromberg v. California, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), have received our attention, as have the other arguments presented by appellant. The former are instructive, but not controlling. We are not persuaded by the latter. If there are legitimate reasons for not having a national flag or for not protecting it against contumacious burning, they have not been advanced, nor are we aware of them.

### OTHER CONTENTIONS

### SUFFICIENCY OF THE EVIDENCE

▪ The trial judge instructed the jury that the government was bound to prove each of the essential elements of the crime created by § 700 and outlined the essentials as shown in the footnote.[6]

6. "Now the essential elements of the crime of casting contempt upon the flag of the United States of America by burning it, which the Government has the burden of

proving beyond a reasonable doubt, are as follows: One, if any crime at all occurred, it must have taken place within the District of Arizona, that is the State

Prior to giving the instruction, the judge correctly defined the phrases "casting contempt" and "publicly burn", as used in the instructions. Additionally, he gave the jury the definition of the flag of the United States as outlined in 4 U.S.C. §§ 1, 2. Our examination of the record convinces us that there is substantial evidence in support of each of the essential elements of the crime. The judge submitted to the jury the issue on whether appellant was, in fact, the criminal actor.[7] The jury resolved that issue against her. Needless to say, we are bound by the rule that an appellate court is required to consider the evidence in the light most favorable to the prosecution. Glasser v. United States, 315 U.S. 60, 62, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Kay v. United States, 421 F.2d 1007, 1010 (9th Cir. 1970); and United States v. Wilson, 447 F.2d 1, 3 (9th Cir. 1971).

## DOUBLE JEOPARDY

Although appellant raises this issue, she does not discuss it with particularity. She was first indicted in the state court in connection with the same incident for violation of an Arizona statute, which was declared unconstitutional by the three-judge panel in Crosson v. Silver, *supra*. The state court prosecution did not proceed beyond the information stage. *Id.* p. 1086 n. 2. Before any action, other than a motion to quash the information, was taken in the state court, the appellant commenced an action in the United States District Court for the District of Arizona asking that the Arizona statute be declared un-constitutional. The three-judge court agreed with appellant and we assume that the state of Arizona dismissed the information, as suggested by the court. In these circumstances, appellant was not placed in jeopardy by the mere filing and dismissal of the Arizona information. Aside from the fact that the Arizona prosecution never reached a stage beyond the filing of the information and the dismissal thereof by reason of a federal court suggestion, appellant finds herself faced with the rule that the double jeopardy provisions of the Fifth Amendment do not prevent successive prosecutions by the state and federal government for the same offense. Bartkus v. Illinois, 359 U.S. 121, 79 S. Ct. 676, 3 L.Ed.2d 684 (1959); United States v. Lanza, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922), specifically reaffirmed by Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). The rule has recently been restated in United States v. Smith, 446 F. 2d 200, 202 (4th Cir. 1971) and United States v. Synnes, 438 F.2d 764, 773 (8th Cir. 1971). Cases such as Waller v. Florida, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970), concerned with the successive municipal and state prosecutions within the same Sovereignty are readily distinguishable.

## VOIR DIRE EXAMINATIONS

During the course of the voir dire one of the jurors, in response to one of the court's questions, said, among other things, "When they burn the flag, they hurt me because they hurt my country." When asked if this would

---

of Arizona; secondly, a flag of the United States of America must have been burned in a public place by the defendant; thirdly, any burning of the flag of the United States of America by defendant must have been performed as a means of casting contempt upon such flag; and fourthly, you must find that the defendant knowingly did the act which is forbidden by the law, and intended to burn the flag of the United States of America as a means of casting contempt upon it." [R.T. 247].

7. "Now the evidence in this case raises the question of whether the defendant was in fact the criminal actor, and it necessitates your resolving of any conflict or uncertainty in the testimony on that issue or relating to that issue. Now the burden of proof is, as I told you, on the prosecution with reference to every element of the crime charged, and this burden includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime charged." [R.T. 247].

affect his duties as a fair and an impartial juror, the juror responded that it would and was immediately excused. Thereupon, counsel for appellant moved for a mistrial on "the basis of the statements of the proposed juror [was "a rather inflammatory statement in the presence of the other jurors."]." Two other jurors, on examination, made somewhat similar statements. Our examination of the voir dire makes it perfectly clear that each of the jurors who served on the trial qualified as being fair and impartial, under rather strict and precise questions by the judge. The burden was on appellant to show some discrimination or bias in the selection process. Long v. United States, 422 F. 2d 1024, 1027 (9th Cir. 1970). Appellant has failed to bring herself within this rule. For that matter, the transcript of the voir dire clearly establishes that the trial court made every reasonable effort to discover any possible prejudice in the minds of the jurors. This contention is groundless, as is the contention that the sentence imposed is cruel and unusual punishment. Certainly, the punishment imposed does not rise to constitutional dimensions.

The record as a whole demonstrates that the appellant had a fair trial. We find no error and, therefore, affirm.

BROWNING, Circuit Judge (dissenting).

Most of the First Amendment issues that once might have been raised on the facts of this case have been settled by the Supreme Court adversely to the government. On the basis of principles announced in the most relevant Supreme Court decisions, it is reasonably clear that appellant's act of protest, ineffectual and offensive as it may have been,[1] cannot be punished by government consistent with the First Amendment.[2]

I

A. The Court has held that under the First Amendment, the government has no legitimate interest in compelling an individual to express respect for the flag and what it symbolizes. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L. Ed. 1628 (1943). This conclusion was held to follow from the central notion that in this country it is not the business of government to prescribe the "right" opinion in political matters.

When first confronted with this question in Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940), the Supreme Court had held to the contrary. In *Gobitis*, the Court sustained the power of the state to require school children to salute the flag as an appropriate means of fostering "patriotic impulses," "an attachment to the institutions of their country," and "[n]ational unity [which] is the basis of national security." *Id.* at 595, 60 S. Ct. at 1013. But *Gobitis* was shortlived.

---

1. Appellant's behavior was crude and pointless. As a school teacher, she presumably possessed the verbal skills to articulate her opposition to involvement in the Vietnam conflict and the means to communicate her views effectively to a reasonably large audience. Instead, she elected to express her disapproval through a melodramatic and ineffective charade calculated to offend the deep sensibilities of many patriotic people.

   It is also true, however, that there were far more important uses for the professional skill and devotion of state and federal law enforcement officers than spying upon a handful of young people engaged in a peaceful demonstration and doggedly pursuing a foolish but harmless young woman through state and federal criminal courts.

   Neither the freedom of our society nor its security is seriously at stake in this litigation.

2. Halter v. Nebraska, 205 U.S. 34, 27 S.Ct. 419, 51 L.Ed. 696 (1907), an early case upholding a state law against commercial use of the flag, was decided before the First Amendment was held applicable to the states in Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). No First Amendment issues were considered or decided in *Halter.*

In *Barnette,* decided three years later, the Court recognized that the flag salute was symbolic speech, a form of expression requiring an "affirmation of a belief and an attitude of mind", 319 U.S. at 632–633, 63 S.Ct. at 1083, and that it was therefore subject to the First Amendment. The Court rejected the *Gobitis* premise that the government could require an individual to express respect toward the flag in the interest of national unity. It adopted precisely the opposite premise. The Court held that the First Amendment guaranteed the individual's right "to be intellectually and spiritually diverse or even contrary." *Id.* at 641, 63 S.Ct. at 1187. The "freedom to differ," the Court said, "is not limited to things that do not matter much"; it includes "the right to differ as to things that touch the heart of the existing order." *Id.* at 641–642, 63 S.Ct. at 1187. Under the First Amendment, the Court concluded, "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.* at 642, 63 S.Ct. at 1187.

*Barnette* stands for the proposition that because government in this country cannot compel an individual to entertain or express respect for the institutions and ideas that the flag symbolizes, government cannot compel an individual to entertain or express itself.

B. In *Barnette* the government sought to *compel* the expression of *respect* toward the flag; in this case the government seeks to *prevent* the expression of *disrespect.* There is no apparent reason why this difference should be significant in applying the Constitution's guaranty against interference with free expression, and Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L. Ed.2d 572 (1969), establishes that it is not.

*Street* holds that under the First Amendment, there is no legitimate governmental interest in punishing expressions of disrespect for the flag. The reason is the same as that underlying *Barnette.* The individual's right to express disagreement with the government includes the right to express that disagreement in terms of the symbol the government has chosen to represent itself.

Upon hearing of the shooting of James Meredith, a civil rights leader, Street carried his American flag into the street and burned it, shouting, "We don't need no damn flag," and "If they let that happen to Meredith we don't need an American flag." The State of New York convicted him under a statute making it a crime to "publicly . . . cast contempt upon [any American flag] by words." The Supreme Court reversed, holding that the state statute "was unconstitutionally applied in appellant's case beause it permitted him to be punished merely for speaking defiant or contemptuous words about the American flag." 394 U.S. at 581, 89 S.Ct. at 1360.

The Court concluded that no interest of the state justified Street's conviction for speaking disrespectfully about the flag.[3]

3. The Court rejected the contention that Street could be punished because his words may have offended persons passing by. The Court observed that "[e]xcept perhaps for appellant's incidental use of the word 'damn', upon which no emphasis was placed at trial, any shock effect of appellant's speech must be attributed to the content of the ideas expressed"; and "[i]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." 394 U.S. at 592, 89 S.Ct. at 1366.

The Court further held that "such a conviction could not be supported on the theory that by making the above-quoted remarks about the flag appellant failed to show the respect for our national symbol which may properly be demanded of every citizen." *Id.* at 593, 89 S.Ct. at 1366.

The Court recognized that the state had a legitimate interest in preventing breaches of the peace, but held that the New

The Court expressly relied upon the decision in *Barnette,* thus rejecting any difference, for constitutional purposes, between the "affirmative compulsion" of the flag salute struck down in *Barnette* and the "negative prohibition" of flag desecration statutes. Quoting from *Barnette,* the Court said:

> "We have no doubt that the constitutionally guranteed 'freedom to be intellectually . . . diverse or even contrary,' and the 'right to differ as to things that touch the heart of the existing order,' encompass the freedom to express publicly one's opinions about our flag, including those opinions which are defiant or contemptuous." *Id.* at 593, 89 S.Ct. at 1366.

## II

A. *Street* differs from the present case in only one respect. Street was convicted of having "cast contempt upon [the flag] by words,"[4] while Mrs. Crosson was convicted because she "knowingly cast contempt upon a flag of the United States by . . . burning." This difference between words and conduct, it is said, distinguishes the two cases for First Amendment purposes.

As *Barnette* demonstrates, First Amendment limitations upon governmental power to directly regulate the expression of views regarding the flag apply to nonverbal expression as well as to verbal expression.[5] And the Court's reliance upon *Barnette* in *Street* demonstrates that the First Amendment standards applicable to direct governmental regulation of verbal and nonverbal expression are the same.

In *Street,* it is true, the Court saved the question of whether "Street could be punished for his burning of the flag, even though the burning was an act of protest." *Id.* at 594, 89 S.Ct. at 1366. The question thus reserved is the effect of the First Amendment upon governmental power to regulate conduct *per se* (*i. e.,* for reasons unrelated to any communicative aspect) where it appears that, in a particular case, the conduct was intended to express an idea—the question dealt with in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

The question presented in the present case is the quite different one of the effect of the First Amendment upon the government's power to regulate the expression of opinion in nonverbal, rather than verbal, form.

As noted, *Barnette* and *Street,* together, suggest that the answer to the latter question is that direct governmental regulation of nonverbal expression is subject to the same limitations under the First Amendment as direct regulation of verbal expression, as distinguished from the less stringent standards applied under United States v. O'Brien, *supra,* 391 U.S. at 377, 88 S.Ct. 1673, to regulation aimed at controlling conduct which may involve expression only incidentally.

This conclusion is supported by Stromberg v. California, 283 U.S. 359,

York statute, on its face and as applied to Street, could not be sustained as a prohibition of words that might provoke retaliation or incite others to commit unlawful acts. *Id.* at 591–592, 89 S.Ct. 1354. For reasons noted later, the governmental interest in preventing breaches of peace cannot support Mrs. Crosson's conviction either.

4. The statute, the information, and the evidence encompassed both Street's contemptuous words about the flag and his act of burning it. The Supreme Court concluded that his conviction may have rested either on his words alone or on both his words and his act. 394 U.S. at 590, 89 S.Ct. 1354.

5. The ceremony involved in *Barnette* included a verbal pledge as well as a hand salute, but the Court made it clear that compelling the salute itself, given added symbolic meaning by the pledge, was barred by the First Amendment. "There is no doubt that, in connection with the pledge, the flag salute is a form of utterance." 319 U.S. at 633, 63 S.Ct. at 1182. The Court cited a number of illustrations of coerced salutes that did not involve words. *Id.* at 633 n. 13, 63 S.Ct. 1178.

51 S.Ct. 532, 75 L.Ed. 1117 (1931), as interpreted in *O'Brien*.

In *Stromberg*, the Court considered the constitutionality of a statute prohibiting the act of displaying a red flag in a public place "as a sign, symbol or emblem of opposition to organized government." 283 U.S. at 361, 51 S.Ct. at 533. The statute was a direct prohibition of the expression of an idea through conduct. It punished not the act of displaying a red flag, but rather the communication of the idea of opposition to government by the act of displaying a red flag. Because the statute permitted the punishment of peaceful and orderly opposition to government, the Court held the statute invalid as a denial of the constitutionally guaranteed opportunity for free political discussion.

*Stromberg* was re-examined in *O'-Brien*. While distinguishing *Stromberg*, the Supreme Court in *O'Brien* emphasized its scope and continuing vitality.

O'Brien burned his Selective Service registration certificate as a demonstration of protest against the Vietnam conflict. He was convicted under a section of the Selective Service Act providing for the punishment of one who "knowingly destroys, [or] knowingly mutilates" such a certificate. The Court rejected O'Brien's contention that his conviction violated the First Amendment.

The Court distinguished *Stromberg*, noting that the Selective Service Act simply prohibits the destruction of a certificate without regard to circumstances or purpose; it "does not distinguish between public and private destruction, and it does not punish only destruction engaged in for the purpose of expressing views," as did the statute

in *Stromberg*. 391 U.S. at 375, 88 S.Ct. at 1678.

The Court pointed out that the prohibition against the destruction of a Selective Service certificate served many important government interests wholly unrelated to the suppression of expressions of protest. The certificate provided the government with a ready means of verifying the registration and classification of the individual; it provided a potentially useful notice device; and the information it contained facilitated communication between the registrant and his local board. All these purposes were frustrated by destruction of the certificate; and none of them had any relation to the suppression of any message the registrant might intend to convey by destroying his certificate. Under the statute, the Court said, O'Brien was punished for "this noncommunicative impact of his conduct, *and for nothing else.*" *Id.* at 382, 88 S.Ct. at 1682 (emphasis added).[6] The Court continued:

"The case at bar is therefore unlike one where the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful. In Stromberg v. [People of State of] California, 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed. 1117] (1931), for example, this Court struck down a statutory phrase which punished people who expressed their 'opposition to organized government' by displaying 'any flag, badge, banner, or device.' *Since the statute there was aimed at suppressing communication it could not be sustained as a regulation of noncommunicative conduct.* See also, NLRB v.

6. For purposes of comparison the Court cited other examples of statutes directed solely at the suppression of conduct inimical to legitimate governmental interests: "A law prohibiting destruction of Selective Service certificates no more abridges free speech on its face than a motor vehicle law prohibiting the destruction of drivers' licenses, or a tax law prohibiting the destruction of books and records." 391 U.S. at 375, 88 S.Ct. at 1678.

Neutral and nondiscriminatory regulation of traffic and use of the streets is another example. "One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest." Cox v. Louisiana, 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed. 2d 471 (1965).

Fruit & Vegetable Packers Union, 377 U.S. 58, 79, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (concurring opinion)." Id. (emphasis added).

Thus, a statute nominally directed at the regulation of conduct but in substance aimed at suppressing communication must meet the First Amendment standards applied to the suppression of speech itself, and not merely the standards applied in *O'Brien* to the regulation of conduct in its noncommunicative aspect.

B. In the present case, the statute, the charge, and the evidence were all directed at punishing the communicative aspect of Mrs. Crosson's conduct—the expression of an idea, and, more specifically, the expression of an idea the government found abhorrent.

18 U.S.C. § 700 does not simply prohibit the burning of a flag. It punishes one who "knowingly casts contempt" upon a flag, by various means, including burning. The burning of a flag is not inherently contemptuous, *see, e. g.*, 36 U.S.C. § 176(j); and by its terms the statute punishes only flag burning that expresses contempt. Flag burning that is not communicative is not prohibited, nor, for that matter, is flag burning or other conduct that expresses loyalty and respect.[7] The statute does not prohibit the private destruction of a flag even if

done to express contempt. The conduct is punished only if done "publicly," that is, under such circumstances that the contempt expressed by the conduct may be communicated to another. Thus, precisely contrary to the statute upheld in *O'Brien*, 18 U.S.C. § 700 "*does* . . . distinguish between public and private destruction, and *does* . . . punish only destruction engaged in for the purpose of expressing views." United States v. O'Brien, *supra*, 391 U.S. at 375, 88 S.Ct. at 1678 (emphasis added).

Section 700 accurately reflects the interest the government seeks to serve. That interest is in the flag as a symbol, not as a physical object. The physical destruction of a flag—the noncommunicative element of the prohibited conduct—affects no governmental interest. The value of the flag as a symbol is not diminished by the physical destruction of one flag or of many. The government is interested only in the suppression of the public display of defiance and contempt for the flag—the communicative element of the prohibited conduct—for it is thought that the value of the flag as a symbol may be adversely affected by the public manifestation of such attitudes.

The majority disposes of the matter by stating that section 700 prohibits only "the *physical* act of contemptuously burning a flag . . . ." (emphasis

---

7. Destruction of the flag "in a dignified way, preferably by burning" is authorized by 36 U.S.C. § 176(j). The lack of neutrality toward the point of view expressed by flag burning, evidenced by this statute and 18 U.S.C. § 700, raises an additional problem under the First Amendment. The Supreme Court has held that a statutory regulation that permits particular conduct when it reflects approval of government but prohibits such conduct when it reflects disapproval, offends First Amendment standards. *See* Schacht v. United States, 398 U.S. 58, 90 S.Ct. 1555, 26 L.Ed.2d 44 (1970). Schacht was convicted under 18 U.S.C. § 702, which prohibits the wearing of a uniform of the armed forces of the United States "without authority." The evidence was that Schacht wore portions of such a uniform while portraying a soldier in a skit performed in a demonstration opposing American participation in the Vietnam conflict. He asserted as a defense the provision of 10 U.S.C. § 772(f) that persons not on active duty (like Schacht) were authorized to wear a uniform as an actor portraying a member of one of the armed forces "if the portrayal does not tend to discredit that armed force." Obviously, Schacht did not satisfy the quoted condition. The Supreme Court held that the defense was good nonetheless. "The final clause of § 772(f) which leaves Americans free to praise the war in Vietnam but can send persons like Schacht to prison for opposing it, cannot survive in a country which has the First Amendment. To preserve the constitutionality of § 772(f) that final clause must be stricken from the section." 398 U.S. at 63, 90 S.Ct. at 1559. *See also* Comment, Flag Burning, Flag Waving and the Law, 4 Valparaiso L.Rev. 345, 356 (1970).

added). *See also* Joyce v. United States, 454 F.2d 971, 983 (D.C.Cir.1971). This is a contradiction in terms. "Burning" is a physical act, but "*contemptuously burning*" is necessarily an expression of an attitude or idea. And only such communicative burnings are prohibited by section 700.

The indictment against appellant followed the statute, charging that she "did knowingly cast contempt upon a flag by publicly burning such flag."

The government proved more than the mere burning of the flag. Evidence was offered that appellant intended by her act to cast contempt upon the flag as a means of expressing her opposition to the government's participation in the Vietnam conflict. Witnesses described the anti-war demonstration that preceded the burning, the gathering of the demonstrators on the second floor of the ROTC building, the bringing in of the flag appellant had carried in the parade, appellant's words,[8] and the burning itself. The public nature of the area in which the burning occurred was carefully established.

The jury was instructed, "it is not sufficient for the Government to prove beyond a reasonable doubt merely that the defendant burned a flag of the United States of America. The proof must also show beyond a reasonable doubt that the burning of such flag was performed as a means of casting contempt upon such flag." "Casting contempt" was defined as "showing or indicating open disrespect or scorn."

It is thus indisputably clear that appellant was punished because of the communicative element of her conduct. It is of no moment, of course, that a Senate Report asserts that the statute "does not prohibit . . . the communication of ideas, or political dissent or protest." *See* note 5, majority opinion; *see also* Joyce v. United States, *supra*, 454 F.2d at 990. Congress cannot bootstrap the statute into conformity with the Constitution by self-serving declarations that the statute does not do what on its face and as applied it clearly does.

Accordingly, Mrs. Crosson's conviction can be sustained only if it meets the constitutional standards under which government may punish speech.

### III

It has been said that the cases reflect two such standards, applied in different contexts, or at least at different times in the somewhat uneven development of First Amendment doctrine: (1) Whether the speech presented a "clear and present danger" of substantive evils the government is empowered to prevent, and (2) whether on balance the government's interest in suppressing the speech outweighed the interest in free expression.[9] Whether there are two distinct tests, and whether the one or the other applies in a case such as this, is of no moment. It is evident that Mrs. Crosson's prosecution should not be sustained under either.

A. It may be that in some contexts flag desecration to convey a message of protest would create a clear and present danger of breach of the peace or of incitement to crime.[10] The government concedes, however, that neither section

---

8. Undercover agents of Arizona's Department of Public Safety testified that Mrs. Crosson said, in an "emotional tone," "We are going to burn this fucking rag"; and that she later "advised everybody to throw a match on the flag so that the pigs couldn't blame any one person for burning the flag."

9. *See, e. g.*, Note, Symbolic Conduct, 68 Colum.L.Rev. 1091, 1118–21 (1968); Comment, Flag Burning, Flag Waving and the Law, 4 Valparaiso L.Rev. 345,

352–54 (1969); *see, also* Note, The New Metaphysics of the Law of Obscenity, 57 Calif.L.Rev. 1257, 1259–61 (1969).

10. *See generally* Street v. New York, *supra*, 394 U.S. at 591–592, 89 S.Ct. 1354. Of course, a statute based on these interests could be sustained only if narrowly confined to avoid unnecessary suppression of expression. *Id.* at 592, 89 S.Ct. 1354; O'Brien v. United States, *supra*, 391 U.S. at 377, 88 S.Ct. 1673. The government concedes that § 700 would not

700 nor this prosecution can be supported on these grounds, even assuming the national government possesses the equivalent of the states' police power to prevent such evils.[11]

As the government states, "The legislative history of 18 U.S.C. § 700 . . . indicates that this was never intended to be a peace-preserving statute" (Appellee's brief 37); and further, "there was no evidence at the trial one way or the other of the effect on the public peace of the community which resulted from appellant's burning the flag" (Appellee's brief 36).

B. Nor can Mrs. Crosson's conviction be sustained by balancing the governmental interest served by the prosecution against the adverse impact on free expression. The government relies upon a single interest, namely, "its interest in the preservation of the flag as a symbol of unity on national ideals and purpose."[12] As important as this interest undoubtedly is,[13] it could not be more clear that it cannot justify compelling expression of respect for the flag, West Virginia State Board of Education v. Barnette, supra, 319 U.S. at 640–642, 63 S.Ct. 1178, 87 L.Ed. 1628); see also Long Island Vietnam Moratorium Comm'n v. Cahn, 437 F.2d 344, 349 (2d Cir. 1970), or justify suppressing expression of disrespect for the flag, Street v. New York, supra, 394 U.S. at 593, 89 S.Ct. 1354.

Since the national interest in patriotism, loyalty, and unity does not warrant censorship of contemptuous and disrespectful views directed against the government itself, it can hardly justify censorship of such views when directed against the mere symbol of government.

No doubt the government and those who lead it should, indeed must, foster patriotism and loyalty, for these are powerful forces channeling dissatisfaction and disaffection into efforts to improve society rather than to destroy it. See note 13, supra. "Under the Constitution, however, there is no governmental power to enforce a particular norm of patriotism, no matter how desirable it might appear to be." Thayer, Freedom of Speech and Symbolic Conduct: The Crime of Flag Desecration, 12 Ariz.L. Rev. 71, 84 (1970). "National unity is an end which officials may foster by persuasion and example," but not by compulsion. West Virginia State Board of Education v. Barnette, supra, 319 U.S. at 640, 63 S.Ct. at 1186.

### IV

Although it seems clear that the O'Brien test is not applicable to the prosecution of Mrs. Crosson under section 700, for the reasons suggested in Part II A, this prosecution would fare no better if the O'Brien test were applicable.

The most obvious deficiency is the failure to satisfy the requirement that the governmental interest served by the regulation and punishment of the conduct must be "unrelated to the suppres-

meet their test, stating "since the federal statute on its face was not designed to be limited to proscribing acts which resulted in breaches of the peace it is not so limited" (Appellee's brief 37).

11. As authority that the federal government lacks such power, appellant cites United States v. DeWitt, 9 Wall 41, 76 U.S. 41, 19 L.Ed. 593 (1869); Keller v. United States, 213 U.S. 138, 29 S.Ct. 470, 53 L.Ed. 737 (1909); and Craig v. Steele, 123 F.Supp. 153 (W.D.Mo.

1954), to which the amicus curiae adds Tennessee v. United States, 256 F.2d 244 (6th Cir. 1958).

12. Adopted by the government from Sutherland v. De Wulf, 323 F.Supp. 740, 744 (S.D.Ill.1971).

13. See generally Prosser, Desecration of the American Flag, 3 Ind.Leg.Forum 159, 220–27 (1969); Comment, Flag Burning, Flag Waving and the Law, 4 Valparaiso L.Rev. 345, 356 (1970).

sion of free expression." 391 U.S. at 377, 88 S.Ct. at 1679.

As noted earlier, Part II A, the *O'Brien* court distinguished that case from one "where the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful," and stated that if a statute were "aimed at suppressing communication, it could not be sustained as a regulation of noncommunicative conduct." *Id.* at ˙382, 88 S. Ct. at 1682.

As demonstrated above, Part II B, the sole interest served by the prosecution of Mrs. Crosson is the suppression and punishment of her expression of contempt for the flag and the ideas and institutions it represents. This stands in marked contrast to the neutrality toward expression required under *O'Brien.*

## V

The power of the flag to evoke emotion and to influence judgment is great, for to many the flag symbolizes the qualities and ideals of the society they treasure most. A case such as this "is made difficult not because the principles of its decision are obscure but because the flag involved is our own." West Virginia State Board of Education v. Barnette, *supra,* 319 U.S. at 641, 63 S. Ct. at 1187. Justice Harlan's conclusion in Street v. New York, *supra,* 394 U.S. at 594, 89 S.Ct. at 1367, would be equally appropriate here:

> "We add that disrespect for our flag is to be deplored no less in these vexed times than in calmer periods of our history. Cf. Halter v. Nebraska, 205 U.S. 34 [27 S.Ct. 419, 51 L.Ed. 696] (1907). Nevertheless, we are unable to sustain a conviction that may have rested on a form of expression, however distasteful, which the Constitution tolerates and protects."

The conviction should be reversed.